UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
LELAND EAVES and CANDO CONSULTANT
SERVICES, INC., individually and for all others similarly
situated,

                                     Plaintiffs,

            – against –

DESIGNS FOR FINANCE, INC., MORITT, HOCK,
HAMROFF & HOROWITZ LLP, and PRUSKY LAW
ASSOCIATES, P.C.,

                                 Defendants.
------------------------------------------------------------------------x

**OPINION AND ORDER**

No. 09-cv-3952 (CS)

<u>Appearances:</u>

John Balestriere
Geisa Balla
Balestriere Fariello
New York, New York
*Counsel for Plaintiffs*

David S. Richan
Baritz & Colman LLP
New York, New York
*Counsel for Defendant Designs for Finance, Inc.*

Anthony P. Colavita
Scott E. Kossove
L'Abbate, Balkan, Colavita & Contini, L.L.P.
Garden City, New York
*Counsel for Defendant Moritt, Hock, Hamroff & Horowitz LLP*

Jeffrey B. McCarron
Kathleen M. Carson
Swartz Campbell LLC
Philadelphia, Pennsylvania
*Counsel for Defendant Prusky Law Associates, P.C.*

<u>Seibel, J.</u>

       Before the Court are Defendants' Motions to Dismiss Plaintiffs' Second Amended

Complaint.  (Docs. 53, 56, 59.)

## I.   BACKGROUND

### A.   Facts

For the purposes of the instant motions, the Court assumes the facts, although not the legal conclusions, in the Second Amended Complaint to be true.  Plaintiff Leland Eaves is a Colorado resident and the owner of Plaintiff Cando Consultant Services, Inc. ("Cando"), a Florida-based construction services company.  (SAC ¶¶ 8–9.)[1]  Plaintiffs allege that in the late 1990s and early 2000s, Defendants Designs for Finance, Inc. ("Designs"), Moritt, Hock, Hamroff & Horowitz LLP ("Moritt"), and Prusky Law Associates, P.C. ("Prusky") devised a scheme to market and sell illegal tax shelters, including, and most notably for the purposes of this case, the BETA Multiple Employer Death Benefit Plan (the "BETA Plan").  (*Id.* ¶¶ 1, 31.) Despite knowing it to be an illegal tax shelter, Defendants represented the BETA Plan as a legitimate multiple-employer welfare benefit plan under Section 419A(f)(6) of the Internal Review Code ("IRC").  (*Id.* ¶ 2.)  Such plans are funded through the purchase of life insurance and annuities, and their purpose is to fund the insurance needs of the small businesses that buy into them.  (*Id.* ¶ 32.)  As such, the Internal Revenue Service ("IRS") permits participating businesses to take tax deductions for contributions to the plan—but only to the extent that such contributions are for legitimate insurance needs, not as a form of deferred compensation.  (*Id.*)

Designs acted as the BETA Plan Sponsor and, in that capacity, created and "primarily advocated" for the plan.  (*Id.* ¶¶ 2, 36a.)  Knowing that the IRS considered plans structured similarly to the BETA Plan to be illegal tax shelters, Designs opted not to obtain a private letter ruling from the IRS regarding the plan; instead, it sought legal analysis from Defendant Moritt, a

---

[1]   "SAC" refers to the Second Amended Complaint, filed April 16, 2010.  (Doc. 51.)

New York–based law firm.  (*Id.* ¶¶ 6, 12.)  Despite knowing that, as Plaintiffs allege, "IRS laws were not strong and that it was skating on thin ice by approving the BETA Plan," Moritt endorsed the plan in a 54-page opinion letter to Designs dated September 24, 2000—a letter, Plaintiffs allege, that contained "questionable analysis of IRS code and case law."  (*Id.* ¶¶ 6, 36b.)

In July 2001, Plaintiffs' accountant Jack Winebrenner suggested to Eaves that he look into the BETA Plan for use with his small business, Cando.  (*Id.* ¶ 37.)  Winebrenner had received information regarding the plan from John Rau, an agent of CNA, one of the plan's marketers and funders, who himself had received information from Designs.  (*Id.* ¶ 38.)  Winebrenner prepared a packet of information for Plaintiffs (the "BETA Plan Sales Packet"), which included a letter from Rau, an overview of the plan, questions and answers regarding the plan, cost information, and Moritt's September 24, 2000 opinion letter to Designs.  (*Id.* ¶¶ 38–39, Ex. B.)   After reading through the BETA Plan Sales Packet, which Plaintiffs allege was "endorsed" by both Designs and Moritt, Plaintiffs decided to enroll in the BETA Plan in October 2001.  (*Id.* ¶ 40.)

Starting in 2001, and continuing through 2007, Plaintiffs made annual contributions of $40,000 to the BETA Plan and, "as advised by Rau and Defendants Moritt . . . and Designs," claimed the same amount as annual tax deductions.  (*Id.* ¶¶ 40–41.)  In 2003, the IRS issued stricter regulations on multiple-employer benefit plans under Section 419A(f)(6) of the IRC.  (*Id.* ¶ 34.)  In response to those regulations, Designs signed a BETA Plan Severance Agreement, effective January 1, 2003, that effectively transformed the BETA Plan from one multiple-employer plan ("MEP") into several single-employer plans ("SEP").  (*Id.* ¶¶ 34, 43.)  This change in plan structure resulted in a split-dollar life insurance arrangement for plan participants,

pursuant to which plan benefits would be separated between employers and shareholder-employees.  (*Id.* ¶ 34.)

In February 2004, Rau sent a letter to Winebrenner (who presumably forwarded the letter to Plaintiffs, as they have attached the letter to their Second Amended Complaint) stating that the IRS regulations had made the BETA Plan strategy "stronger than ever."  (*Id.* ¶ 42, Ex. C.) Plaintiffs allege, instead, that the changes made the plan strategy riskier, and that Designs should have been aware of the risks associated with the regulations and alerted Plaintiffs to such risks. (*Id.* ¶ 42.)  In December 2004, the BETA Plan Administrator sent plan participants a letter notifying them of the plan's re-characterization as a SEP, as described above.  (*Id.* ¶ 45.)  The letter informed Plaintiffs that the changes did not affect them and were made for compliance purposes only.  (*Id.*)  Plaintiffs allege, however, that such changes "solidified the [BETA] Plan as a deferred compensation plan rather than the legitimate welfare benefit plan it was marketed to be," (*id.* ¶ 35); that, under the new plan structure, plan participants' contributions were subject to funding limitations that rendered Plaintiffs' contributions no longer tax-deductible, (*id.* ¶¶ 34, 43); and that, had they been properly informed of how to comply with the IRS regulations, they would not have claimed plan contributions as deductions, and would have paid the necessary taxes on such contributions, (*id.* ¶ 46).

In December 2007, Designs sent a letter to plan participants alerting them to other, new IRS rulings and "attempt[ing] to reassure" them that the plan was still valid.  (*Id.* ¶¶ 47, 49, Ex. E.)  Designs included with that letter a December 7, 2007 memorandum from Defendant Prusky, a Philadelphia-based law firm, to Designs that "further advocated for the legality of the BETA Plan in spite of the IRS revisions."  (*Id.* ¶ 48, Ex. E.)  The Prusky memo also recommended that plan participants file a Form 8886 with the IRS disclosing contributions to the BETA Plan and

associated tax deductions, and warned participants that even if the IRS found the deductions to be appropriate, it could nonetheless opt to impose penalties for a failure to file a Form 8886.  (*Id.* ¶ 50, Ex. E.)[2]  Eaves filed his Form 8886 shortly thereafter.  (*Id.* ¶ 53, Ex. G.)  Eaves did not trust Prusky's evaluation of the BETA Plan and therefore opted *not* to claim as a tax deduction his $40,000 contribution to the BETA Plan for the 2007 tax year.  (*Id.* ¶ 57.)

Eaves received a letter from the IRS dated March 26, 2008, notifying him that he would be audited due to his participation in the BETA Plan for the years 2005, 2006, and 2007.  (*Id.* ¶ 54, Ex. A.)  He received another letter from the IRS on February 26, 2010, analyzing his involvement in the BETA Plan as an employee-shareholder and stating that he owed approximately $250,000.  (*Id.* ¶ 54, Ex. D.)[3]  Cando also received a letter from the IRS on February 26, 2010, detailing the taxes, interest, and penalties owed to the IRS for its involvement in the BETA Plan for tax years 2004 through 2008.  (*Id.* ¶ 56, Ex. H.)  Because Eaves did not claim a tax deduction for his 2007 contribution to the plan, Cando suffered no fines for that year.  (*Id.* ¶ 57.)  Nonetheless, the letter specified that Cando owed $4,422.47 in penalties, and a total of $33,620.80 to the IRS.  (*Id.* ¶ 57, Ex. H.)  Eaves's IRS letters stated that contributions to the BETA Plan were not deductible, as the plan "was not created or designed as, nor does it operate as, an employee welfare benefit fund."  (*Id.* ¶ 58, Exs. A, D.)  The letters further stated that the BETA Plan was a deferred compensation plan—that is, it was "simply a means of distributing

---

[2]     On April 9, 2008, Designs sent a follow-up letter to plan participants further urging them to file Form 8886 disclosures.  (SAC ¶ 52, Ex. F.)

[3]     The re-characterization of the BETA Plan as a SEP caused the figure for which Eaves was audited to be based not merely on his $40,000 annual contributions, but instead on the purported economic benefit derived from his involvement in the plan as an employee-shareholder.  (SAC ¶ 55.)

corporate earning[s] and profits to the shareholder-employee(s) [Eaves] in the guise of providing employee benefits," and plan contributions were "made for the personal benefit of the Shareholder-Employee to fund an investment in a cash value life insurance policy as an alternative means of distributing earning and profits." (*Id.* ¶ 58 (second alteration in original) (internal quotation marks omitted).)  Plaintiffs' contributions to the BETA Plan totaled over $300,000 (including fees to Designs and others), and they allege ongoing audits that will cost them that same amount.  (*Id.* ¶ 64.)

For allegedly knowingly misrepresenting and/or endorsing the BETA Plan as a legal welfare benefit plan, when it was instead a disguised deferred compensation plan under which tax deductions were not permitted, Plaintiffs assert the following causes of action:  (1) fraudulent inducement, as against Designs; (2) breach of contract, as against Designs, (3) breach of the implied duty of good faith and fair dealing, as against Designs; (4) fraud, as against Moritt and Prusky; (5) breach of fiduciary and co-fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), as against all Defendants; (6) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), as against all Defendants; (7) violation of New York General Business Law Section 349, as against all Defendants; (8) conversion, as against all Defendants; (9) negligent misrepresentation, as against all Defendants; and (10) civil conspiracy, as against all Defendants.  (*Id.* ¶¶ 81–161.)

As to the fraud claims, Plaintiffs point to the following instances of fraud:  Designs' "marketing strategy and the letters it continued to send to Plaintiffs and Class Members"; Moritt's September 24, 2000 opinion letter to Designs, as well as "letters written by Steven Horowitz in December 2002, and August 12, 2003," in which it "misrepresented the legality of

the Plan"; and Prusky's December 7, 2007 memorandum to Designs and "a legal opinion on July 13, 2005 further affirming the legitimacy of the BETA Plan." (*Id.* ¶ 70.)

### B.      Procedural History

Plaintiff Eaves filed the original Complaint in this case on April 21, 2009, (Doc. 1), against Designs, as well as Pointe Benefit Consultants LLC, North Fork Bank, Capital One Bank, CNA, Sun Life Financial, and Valley Forge Insurance Co.—entities Eaves alleged to have been the administrator, trustee, and various marketers and/or funders of the BETA Plan, respectively, (*id.* ¶ 34).[4]  Eaves voluntarily dismissed the remaining defendants in July and August 2009, (Docs. 14, 21, 22, 23, 24), pursuant to confidential settlement agreements, (*see* SAC ¶ 38 n.1; Doc. 49).  Eaves filed an Amended Complaint on October 7, 2009, naming Designs, Moritt, Prusky, and Rau as defendants.  (Doc. 28.)  The parties appeared before this Court on December 18, 2009 for a pre-motion conference to discuss Defendants' requests to file motions to dismiss.  On December 23, 2009, the parties were referred to mediation, (Doc. 39), which proved unsuccessful, (*see* Doc. 49).  Pursuant to a stipulation and order dated April 12, 2010, (Doc. 50), Eaves filed a Second Amended Complaint on May 20, 2010, in which he joined Cando as a plaintiff and dropped Rau as a defendant, (Doc. 51).  Pursuant to a stipulation and order dated May 19, 2010, (Doc. 52), Defendants moved to dismiss the Second Amended Complaint on June 9, 2010, (Docs. 53, 56, 59).

## II.    DISCUSSION

### A.      Motion to Dismiss Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S.

---

[4]          Winebrenner was never named as a defendant in the case.

Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement]to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted).  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 129 S. Ct. at 1950.

In considering whether a complaint states a claim upon which relief can be granted, the court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determine whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief."  *Id.* Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not 'show[n]'—'that the pleader is entitled to relief.'"  *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

### B.    Documents the Court May Consider on a Motion to Dismiss

When deciding a motion to dismiss, the Court is entitled to consider the following:

(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information

> contained in [a] defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*Weiss v. Inc. Vill. of Sag Harbor*, No. 10-2603, 2011 WL 222480, at *4 (E.D.N.Y. Jan. 24, 2011)

(citation omitted); *accord Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002).

A document is considered "integral" to the complaint where the plaintiff has "reli[ed] on the

terms and effect of [the] document in drafting the complaint." *Chambers*, 282 F.3d at 153

(emphasis omitted). Such reliance "is a necessary prerequisite to the court's consideration of the

document on a dismissal motion; mere notice or possession is not enough." *Id.*; *see Faulkner v.

Beer*, 463 F.3d 130, 134 (2d Cir. 2006) (integral documents may include documents partially

quoted in complaint or on which plaintiff relied in drafting complaint). If a document outside of

the complaint is to form the basis for dismissal, however, two requirements must be met in

addition to the requirement that the document be "integral" to the complaint: (1) "it must be

clear on the record that no dispute exists regarding the authenticity or accuracy of the

document"; and (2) "[i]t must also be clear that there exist no material disputed issues of fact

regarding the relevance of the document." *Faulkner*, 463 F.3d at 134.

     Both Designs and Plaintiffs have submitted with their briefing various documents outside

the Second Amended Complaint. First, Designs has submitted both the original Complaint in

this action, as well as the First Amended Complaint. (Richan Decl. Exs. C, F.)[5] The Court may

take judicial notice of these documents as matters of public record. *See, e.g.*, *Reisner v. Stoller*,

51 F. Supp. 2d 430, 440 (S.D.N.Y. 1999) ("The court may . . . take judicial notice of matters of

---

[5]    "Richan Decl." refers to the Declaration of David S. Richan in Support of Design for Finance, Inc.'s Motion to Dismiss. (Doc. 54.)

public record, such as pleadings and court orders from prior litigation between the parties."). Designs also has submitted the BETA Multiple Employer Death Benefit Plan and Trust, the operative document establishing the plan and setting forth its details.  (Richan Decl. Ex. E)[6]  The Court may consider this document, as Plaintiffs reference the BETA Plan repeatedly throughout the Second Amended Complaint, and, at the very least, relied heavily upon it in drafting the Second Amended Complaint.  *See, e.g.*, *Munno v. Town of Orangetown*, 391 F. Supp. 2d 263, 269 (S.D.N.Y. 2005) (collective bargaining agreement upon which plaintiff relied is integral to complaint).  Designs has also submitted an "Adoption Agreement for the BETA Individual Employer Welfare Benefit Plan," signed by Eaves on December 24, 2004.  (Richan Decl. Ex. A.)[7]  The agreement, pursuant to which Eaves adopted the BETA Plan for Cando after the plan had been converted to a SEP, specifies that it was effective January 1, 2003.  (*Id.* Ex. A, at 2.) Though Plaintiffs do not specifically reference the Adoption Agreement in their Second Amended Complaint, they discuss the financial ramifications of their having adopted the SEP

---

[6]     Mr. Richan notes in his declaration that Exhibit E is the Amended BETA Individual Employer Welfare Benefit Plan and Trust, effective January 1, 2003, (Richan Decl. ¶ 20), but it is clear that the document is instead the original Multiple Employer Death Benefit Plan and Trust, in which Plaintiffs were enrolled from 2001 to 2003, prior to the time the plan was converted to a SEP.  Mr. Richan claims that the Multiple Employer Death Benefit Plan is instead attached to his declaration as Exhibit D, (*id.* ¶ 19), but the document actually attached as Exhibit D is the BETA Plan Sales Packet, which, since it is attached to the Second Amended Complaint, (SAC Ex. B), the Court may nonetheless consider.

[7]     Once again, although Mr. Richan notes that the Adoption Agreement pertains to Plaintiffs' adoption of the MEP version of the BETA Plan, and is dated October 23, 2001, it is clear that the document instead applies to Plaintiffs' adoption of the post-2003 SEP version of the BETA Plan.  While there are various discrepancies between what Mr. Richan describes the documents to be and what they actually are, Plaintiffs do not dispute the authenticity or accuracy of the documents.  (*See* Plaintiffs' Memorandum of Law in Opposition to Defendant Designs for Finance, Inc.'s Motion to Dismiss Plaintiffs' Second Amended Complaint ("Pls.' Opp'n to Designs"), (Doc. 64), at 12–14.)

10

version of the BETA Plan, and it is clear that they relied heavily upon the "terms and effect" of the Adoption Agreement in filing their Second Amended Complaint.  The Court may therefore consider it.

The Court may not consider, however, the document Designs submits entitled "BETA Individual Employer Welfare Benefit Plan Waiver and Representation Agreement."  (*Id.* Ex. B.) Though Eaves signed the document and presumably either had notice or possession of it, this is not enough for the Court to consider it.  While Designs would certainly prefer the Court to consider the document—it contains liability waivers and representations regarding risk and reliance that Designs argues bar some of Plaintiffs' claims—nothing in the document or Second Amended Complaint suggests that Plaintiffs relied on the terms or effect of the document in drafting their Second Amended Complaint.  Such a document is more properly considered on summary judgment.  *See, e.g.*, *In re Bausch & Lomb, Inc. Sec. Litig.*, No. 01-6190, 2003 WL 23101782, at *17 (W.D.N.Y. Mar. 28, 2003) (declining to consider transcript of conference call because "while plaintiffs may have possessed a recording of the conference call, they did not 'rely' upon it in preparing the Complaint").

Plaintiffs have also submitted documents outside the Second Amended Complaint in connection with their Opposition papers to Moritt's motion to dismiss and Prusky's motion to dismiss.  In response to Moritt's motion, Plaintiffs have submitted a December 16, 2002 letter from Moritt to BETA Plan participants, (Balla Decl. ISO Moritt Opp'n Ex. A),[8] a December 17, 2002 letter from Moritt to Designs, (*id.* Ex. B), and an August 12, 2003 letter from Moritt to

---

[8]     "Balla Decl. ISO Moritt Opp'n" refers to the Declaration of Geisa Balla in Support of Plaintiffs' Opposition to Defendant Moritt, Hock, Hamroff & Horowitz, LLP's Motion to Dismiss Plaintiffs' Second Amended Complaint.  (Doc. 63.)

Designs, (*id.* Ex. C).  Because, as noted above, Plaintiffs refer in their Second Amended Complaint to "letters written by Steven Horowitz in December 2002, and August 12, 2003," in which Moritt "misrepresented the legality of the Plan," (SAC ¶ 70), the letters are incorporated by reference in the Second Amended Complaint, and the Court may therefore consider them.

Finally, in connection with their Opposition papers to Prusky's motion, Plaintiffs have submitted a November 13, 2007 Prusky "sponsor memo," (Balla Decl. ISO Prusky Opp'n Ex. A),[9] although it is unclear from the face of the document to whom the memo was sent (*e.g.*, Designs, or the BETA Plan participants).  Plaintiffs never refer to this document in their Second Amended Complaint, and instead premise their allegations regarding Prusky's allegedly fraudulent conduct on a December 7, 2007 sponsor memo to Designs and a July 13, 2005 legal opinion.  (*See, e.g.*, SAC ¶¶ 36c, 47–51, 57, 66–67, 70, Ex. E).  It cannot be said that Plaintiffs relied on the terms and effect of the November 13, 2007 sponsor memo in drafting the Second Amended Complaint, and therefore the document cannot be considered integral to it.  The Court will therefore not consider it.

### C.    Plaintiffs' Claims

#### 1.    Fraudulent Inducement (Claim 1)

Plaintiffs assert a claim for fraudulent inducement against Designs.  To state a claim for fraudulent inducement under New York law,[10] Plaintiffs must allege the following elements: "'(1) that the defendant made a representation, (2) as to a material fact, (3) which was false,

---

[9]      "Balla Decl. ISO Prusky Opp'n" refers to the Declaration of Geisa Balla in Support of Plaintiffs' Opposition to Defendant Prusky Law Associates, P.C.'s Motion to Dismiss Plaintiffs' Second Amended Complaint.  (Doc. 66.)

[10]     The parties do not dispute that New York law applies to all of Plaintiffs' state law claims.

(4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury.'" *Computerized Radiological Servs. v. Syntex Corp.*, 786 F.2d 72, 76 (2d Cir. 1986) (quoting *Brown v. Lockwood*, 432 N.Y.S.2d 186, 193 (2d Dep't 1980)).

Fraudulent inducement claims are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b), which provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b); *see Ebusinessware, Inc. v. Tech. Servs. Grp. Wealth Mgmt. Solutions, LLC*, No. 08-9101, 2009 WL 5179535, at *11 (S.D.N.Y. Dec. 29, 2009) (applying Rule 9(b) to fraudulent inducement claim). "[I]n order to comply with Rule 9(b), 'the complaint must:  (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  While the fraud alleged must be stated with particularity, Rule 9(b) specifies that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Therefore, "the requisite intent of the alleged speaker of the fraud need not be alleged with great specificity."  *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir.1996).  This is because "'a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.'"  *Id.* (quoting *Conn. Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987)).  Nonetheless, a plaintiff "'must allege facts that give rise to a strong inference of fraudulent intent.'"  *Lerner*, 459 F.3d at 290 (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).  "The requisite 'strong inference' of fraud may be established

either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). Finally, a plaintiff "may not lump separate defendants together in vague and collective fraud allegations but must inform each defendant of the nature of his alleged participation in the fraud." *Alki Partners, L.P. v. Vatas Holding GmbH*, No. 09-8125, 2011 WL 651056, at *9 (S.D.N.Y. Feb. 17, 2011).

　　In support of their fraudulent misrepresentation claim, Plaintiffs allege that "Designs knowingly made material misrepresentations to Plaintiffs and Class Members regarding the BETA Plan . . . . in order to induce Plaintiffs and Class Members into participating in the BETA Plan." (SAC ¶¶ 82–83.) The Second Amended Complaint, however, contains scant allegations of misrepresentations made by Designs prior to the time when Plaintiffs actually started participating in the plan in October 2001. Plaintiffs attempt to frame the BETA Plan Sales Packet as a representation by Designs, but that packet contains no documents authored by Designs or any agent thereof. As Designs points out, the sales packet explicitly advertises that it was prepared by Jack Winebrenner, (*id.* Ex. B, at 1), and it contains an introductory letter and other summary materials from John Rau, (*id.* Ex. B, at 3–23)—indeed, Rau states in his letter, "Enclosed, you will find a [welfare benefit trust] overview, questions and answers, plan legal opinion and all costs associated with implantation [*sic*]," (*id.* Ex. B, at 3)—as well as the September 24, 2000 sponsor memo authored by Moritt, (*id.* Ex. B, at 24–77), and a March 8, 1999 letter from Steven A. Horowitz and Horowitz, Mencher, Klosowski & Nestler, P.C. (presumably a predecessor firm to Moritt) to a company called Tan Oriented Plans, Inc., noting that the firm will provide assistance to BETA Plan participants, (*id.* Ex. B, at 78). Plaintiffs

allege only that Designs "endorsed" the sales packet.  (*Id.* ¶ 40.)  Whether this is a reference to

Designs' sponsorship of the plan in general, or their endorsement of the sales packet in

particular, is unclear.  If the latter is intended, no facts are provided explaining how or in what

context Designs "endorsed" the packet, or even what Plaintiffs mean by "endorsed."  Such

allegations are insufficient to adequately allege a misrepresentation, and, at the very least, they

fail the heightened pleading standards of Rule 9(b).

Similarly falling short of Rule 9(b) are Plaintiffs' allegations regarding Designs'

marketing of the BETA Plan.  Indeed, despite titling a section of their Second Amended

Complaint as "Specific Allegations of Fraud," Plaintiffs make only general, repetitive allegations

as to Designs' marketing of the BETA Plan:

- "Defendant[] Designs . . . made false statements and representations to Eaves, Cando and others similarly situated by marketing the BETA Plan as an Internal Revenue Code approved welfare benefit plan or tax shelter that allowed those individuals involved to make tax-deductible contributions toward their post-retirement funds without any retribution from the IRS."  (*Id.* ¶ 65.)

- "Designs marketed the BETA Plan, representing the BETA Plan to be a permissive tax shelter for Plaintiffs and Class Members, while knowing that this was not the case."  (*Id.* ¶ 66.)

- "Designs marketed the BETA Plan as an IRS-approved welfare benefit trust, while knowing that the plan they had created was, instead, a deferred compensation plan. . . . Designs failed to provide the relevant tax information to Class Members, and, as a result, Class Members continued to claim their contributions to the Plan as tax deductions."  (*Id.* ¶ 67.)

- "In the late 1990s and early 2000s, Defendants devised a scheme to sell abusive and illegal tax shelters under the auspices of Section 419 of the IRS Code.  In Plaintiffs' case, during 2001, Designs used the 419 plan structure to create the BETA Plan and lure in Eaves, Cando and other members of the Class under the false pretenses that it was 'one of the last permissible tax shelters recognized by the Internal Revenue Service.'"  (*Id.* ¶ 69.)

- "Designs made the fraudulent statements and representations through its marketing strategy and the letters it continued to send to Plaintiffs and Class Members."  (*Id.* ¶ 70.)

- "In [its] misrepresentations, Designs . . . directed [its] marketing toward all clients, including Eaves and Cando, seeking an IRS approved tax shelter for small businesses that benefited both the employees and employers involved."  (*Id.* ¶ 71.)

As the foregoing allegations demonstrate, Plaintiffs fail to identify who at Designs made the representations, fail to narrow the time frame within which the representations were made to a period shorter than "during 2001," fail to state where the representations were made, and fail to provide any information regarding what form the representations took, *i.e.*, to identify the media through which Designs allegedly marketed the BETA Plan to Plaintiffs.  As such, these allegations fail to allege fraud with specificity under Rule 9(b).  *See, e.g.*, *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 216–17 (S.D.N.Y. 2007) (plaintiff failed to satisfy Rule 9(b) where it asserted that allegedly fraudulent statements were made by defendant's unnamed representatives and failed to provide specific timeframe for statements or identify where statements were made); *Inst. of Applied Human Dynamics v. Mut. of Am.*, No. 02-2331, 2003 WL 22126691, at **3–4 (S.D.N.Y. Sept. 12, 2003) (plaintiff failed to satisfy Rule 9(b) where it "fail[ed] to mention where the misrepresentations were made and only narrow[ed] the relevant time period to two decades," and failed to provide "specific facts that support the allegation that [defendant] 'knowingly and intentionally'" made the representations); *Doehla v. Wathne Ltd., Inc.*, No. 98-6087, 1999 WL 566311, at **17–18 (S.D.N.Y. Aug. 3, 1999) (holding allegations that fraudulent statements were made during four-month period insufficient to satisfy Rule 9(b)); *Sklon Corp. v. Guilford Mills, Inc.*, No. 93-5581, 1997 WL 88894, at *2 (S.D.N.Y. Mar. 3, 1997) (plaintiff failed to satisfy Rule 9(b) where it "fail[ed] to identify with any

particularity . . . the statement made and when and where such statement was made" and identified only a "four-month window" during which all misrepresentations occurred).  While Plaintiffs have adequately explained why statements regarding the purported legality of the BETA Plan tax shelter might be fraudulent, they have failed to detail the "who, when, and where" sufficiently to state a claim against Designs.

Further, although Plaintiffs include allegations that refer only to statements of Moritt and/or Prusky, Plaintiffs attempt to plead fraud through various allegations as to "Defendants" in general, without differentiating among Designs, Moritt, or Prusky.  (*See, e.g.*, SAC ¶¶ 68, 72–77.)  In cases with multiple defendants, however, Rule 9(b) requires that a complaint allege facts specifying each defendant's contribution to the fraud.  *See Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986); *see also Pac. Elec. Wire & Cable Co. v. Set Top Int'l, Inc.*, No. 03-9623, 2005 WL 578916, at *15 (S.D.N.Y. Mar. 11, 2005) ("Plaintiffs' lumping together of fraud allegations against the 'Defendants' . . . does not satisfy Rule 9(b).").  And while such generalities may be excused where, for instance, the facts upon which a plaintiff bases its fraud claim are peculiarly within a defendant's knowledge, *see, e.g.*, *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990), Plaintiffs put forth no such argument.  Indeed, Plaintiffs allege that Designs made misrepresentations *to Plaintiffs*, and, as such, the date, place, and contents of the statements are not facts peculiarly within Designs' knowledge.  Plaintiffs' fraud allegations as to Designs therefore fail to satisfy Rule 9(b).

To the extent that Plaintiffs claim that Designs induced them not only to adopt the MEP version of the BETA Plan in October 2001 but also the SEP version of the BETA Plan in 2003, the claim must still fail.  First, the Second Amended Complaint does not detail any particular communication from Designs (as opposed to the many intermediaries between Designs and

17

Plaintiffs) that induced Plaintiffs to adopt the SEP version of the Plan. Second, "[a] key element

of a fraudulent inducement claim is reasonable reliance." *Brady v. Calyon Sec. (USA)*, 406 F.

Supp. 2d 307, 316 (S.D.N.Y. 2005) (citing *Eternity Global Master Fund, Ltd. v. Morgan Guar.*

*Trust Co. of N.Y.*, 375 F.3d 168, 186–87 (2d Cir. 2004)). But here, Plaintiffs have disclaimed

reliance on any statements that may have induced them to enter the SEP version of the BETA

Plan. The "Adoption Agreement for the BETA Individual Employer Welfare Benefit Plan,"

which, as discussed above, was signed by Eaves on December 24, 2004, and which was effective

January 1, 2003, contains the following disclaimers:

> (1) No tax advice has been given to me by the Sponsor . . . (2) The adoption of
> this Plan, and the Plan's related tax consequences, are the responsibility of the
> Employer and its independent tax and legal advisors . . . (8) Neither the
> Sponsor . . . nor any of [its] . . . agents, advisors, attorneys or employees
> guarantees or promises that any particular tax consequence will result from the
> Employer's or any Employee's participation in the Plan."

(Richan Decl. Ex. A, at 4–5.) These disclaimers are fatal. "[W]here a party specifically

disclaims reliance upon a particular representation in a contract, that party cannot, in a

subsequent action for common law fraud, claim it was fraudulently induced to enter into the

contract by the very representation it has disclaimed reliance upon." *Harsco Corp. v. Segui*, 91

F.3d 337, 345 (2d Cir. 1996); *accord DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 319

(S.D.N.Y. 2002) ("[Plaintiff's] particularized disclaimers make it impossible for it to prove one

of the elements of a claim of fraud: that it reasonably relied on the representations that it alleges

were made to induce it to enter into the Purchase Agreement. A party to a contract cannot allege

that it reasonably relied on a parol representation when, in the same contract, it specifically

disclaims reliance upon [that] particular representation.") (alteration in original) (citation and

internal quotation marks omitted); *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320–21 (1959)

18

("[P]laintiff has in the plainest language announced and stipulated that it is not relying on any representations as to the very matter as to which it now claims it was defrauded.  Such a specific disclaimer destroys the allegations in plaintiff's complaint that the agreement was executed in reliance upon these contrary oral representations.")

Finally, Plaintiffs, in their Second Amended Complaint, admit that they did not rely to their detriment upon the only other specific representations from Designs that they identify: (1) Designs' December 10, 2007 letter to plan participants alerting them to new IRS rulings and enclosing Prusky's December 7, 2007 memorandum, (SAC ¶¶ 47–48, Ex. E), and (2) Designs' April 9, 2008 follow-up letter to plan participants further urging them to file Form 8886 disclosures with the IRS, (*id.* ¶ 52, Ex. F).  As Plaintiffs themselves admit, Eaves did not trust Prusky's evaluation of the BETA Plan that was attached to Designs' December 10, 2007 letter, and, because of this, he opted *not* to claim his BETA Plan contributions as a tax deduction for the 2007 tax year, (*id.* ¶ 57), and even attempted to discontinue his and Cando's involvement in the Plan altogether, (*id.* ¶ 36c; Pls.' Opp'n to Prusky at 2 ("Plaintiffs decided to stop making additional contributions once Prusky released its memo . . . .")).[11]  As a result, no penalties were assessed for that year.  (SAC ¶ 57.)[12]

---

[11]     "Pls.' Opp'n to Prusky" refers to Plaintiffs' Memorandum of Law in Opposition to Defendant Prusky Law Associates, P.C.'s Motion to Dismiss Plaintiffs' Second Amended Complaint.  (Doc. 65.)

[12]     The analysis for the April 9, 2008 follow-up letter is the same, as it contains no new information outside of the December 10, 2007 letter.  Indeed, the entire substance of the April 9, 2008 letter is a quote from the previous letter and a series of disclaimers and qualifications: "[W]e cannot give tax, accounting or legal advice, and nothing contained in these communications should be construed as such . . . .  It is important to note than the filing of [Form 8886] in no way translates into an automatic review and, more importantly, in no way means that

Plaintiffs' fraudulent inducement claim must therefore fail.[13]

### 2.    Fraud (Claim 4)

Plaintiffs assert fraud claims against Moritt and Prusky.  As noted above, the heightened

pleading standards of Rule 9(b) apply to fraud claims.  To state a claim for fraud, Plaintiffs must

allege the following:  "(1) a material misrepresentation or omission of fact (2) made by

defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the

part of the plaintiff; and (5) resulting damage to the plaintiff."  *Crigger v. Fahnestock & Co.*, 443

F.3d 230, 234 (2d Cir. 2006).  As noted above, the fraud claims are based upon Moritt's

September 24, 2000 opinion letter and "letters written by Steven Horowitz in December 2002,

and August 12, 2003" in which Moritt "misrepresented the legality of the Plan," as well as

Prusky's December 7, 2007 memorandum to Designs and "a legal opinion on July 13, 2005

further affirming the legitimacy of the BETA Plan." (SAC ¶ 70.)

I consider first Moritt's September 24, 2000 opinion letter, which was included in the

BETA Plan Sales Packet attached to the Second Amended Complaint, (SAC Ex. B), as well as

the letter from Moritt dated August 12, 2003, which Plaintiffs reference only in passing in the

Second Amended Complaint, (*id.* ¶ 70), and attach to their Opposition papers, (Balla Decl. ISO

Moritt Opp'n Ex. C).  Both of these letters are addressed to Designs, not to Plaintiffs, or even to

BETA Plan participants generally.  Under New York law, a claim for fraud may lie even when a

defendant does not make the statement directly to the plaintiff, but only if (1) the plaintiff

---

tax deductions previously taken will not prevail.  We . . . urge you to contact your own tax
advisors."  (SAC, Ex. F.)

[13]     Designs puts forth a statute of limitations argument with respect to the fraudulent
inducement claim, but I need not reach it in light of the disposition above.

received the information from someone who had received it from the defendant, and (2) the

defendant intended the misrepresentation to be conveyed to him.  *See Sec. Investor Prot. Corp. v.*

*BDO Seidman, LLP*, 222 F.3d 63, 71 (2d Cir. 2000).  Plaintiffs do not allege any facts on the

latter point; rather, they ignore that these letters were not sent to them by Moritt.  Their

allegation that Moritt "directed [its] marketing toward all clients, including Eaves and Cando,

seeking an IRS-approved tax shelter," (SAC ¶ 71), is totally conclusory, and Moritt's intent with

respect to the forwarding of the letter to others is simply unaddressed.

       Even assuming that the Second Amended Complaint could be read as alleging Moritt's

intent to convey the letters to Plaintiffs, the claim would be undone by the language contained

within the letters themselves.  Both letters explicitly state,

> We have rendered this opinion to you [Designs] in order to permit you to
> design and further develop the Program and understand the federal tax issues
> raised with respect to the design of the Program.  This opinion is intended to be
> relied upon only by you and not by participating Employees or Employers. . . .
>        . . . This opinion is addressed to and may be relied upon only by you
> unless our express written consent is obtained after disclosure to us of such facts
> as we deem necessary to address the specific circumstances of any third party.

(SAC Ex. B, at 27; Balla Decl. ISO Moritt Opp'n Ex. C, at 4–5.)  Plaintiffs do not allege—even

upon information and belief—that Designs obtained Moritt's express written consent to forward

these letters to BETA Plan participants for their reliance thereon.[14]  Plaintiffs therefore cannot

---

[14]       Instead, Plaintiffs admit in their Opposition papers that they are "unaware if there was a
written agreement between Moritt Hock and Designs relating to the distribution of the Moritt
Hock Letters," and argue that "[u]ntil sufficient discovery has been completed to refute this fact,
Moritt Hock's motion to dismiss should be denied."  (Plaintiffs' Memorandum of Law in
Opposition to Defendant Moritt, Hock, Hamroff & Horowitz, LLP's Motion to Dismiss
Plaintiffs' Second Amended Complaint ("Pls.' Opp'n to Moritt"), (Doc. 62), at 24.)  The
standard on a Rule 12(b)(6) motion, however, is not speculation as to what discovery will reveal,
but rather the sufficiency of factual allegations in the complaint.  *See, e.g., Global Energy &
Mgmt., LLC v. Xethanol Corp.*, No. 07-11049, 2009 WL 464449, at *2 (S.D.N.Y. Feb. 27, 2009);

sustain a fraud claim as to the September 24, 2000 and August 12, 2003 letters.  *See, e.g.*,

*Mergentime/White v. Metcalf & Eddy of N.Y., Inc.*, No. 89-7188, 1993 WL 72902, at \*\*6–7

(S.D.N.Y. Mar. 11, 1993) (dismissing fraudulent inducement claim because contractual

disclaimers made clear that representations were not directed at plaintiff); *see also Evercrete*

*Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612, 628 (S.D.N.Y. 2006) (dismissing fraud claim where

plaintiff did not allege defendant intended misrepresentation to be relayed to plaintiff); *Chase*

*Manhattan Bank, N.A. v. Fidata Corp.*, 700 F. Supp. 1252, 1261 (S.D.N.Y. 1988) (same).

   I next consider the December 16, 2002 letter from Moritt to BETA Plan participants and

the December 17, 2002 letter from Moritt to Designs.  (Balla Decl. ISO Moritt Opp'n Exs. A, B.)

The December 17, 2002 letter contains the same disclaimer language as the December 24, 2000

and August 12, 2003 letters indicating that the opinions contained therein are directed to and

intended to be relied upon by Designs only, (*id.* Ex. B, at 2–3), but the disclaimer in the

December 17, 2002 letter is undercut by language contained in the December 16, 2002 letter.  As

an initial matter, because the December 16, 2002 letter was addressed to BETA Plan participants,

it cannot plausibly be argued that Moritt did not intend Plaintiffs to rely upon it.  That letter

contains opinions regarding then-recent developments concerning IRC § 419A(f)(6) welfare

benefit plans.  Importantly, that letter also explicitly states to BETA Plan participants that "[i]n

this package *you are also receiving a copy of our opinion to the sponsor* dealing with this issue

and the basis for our opinion as to why Tax Return disclosure is not required by Beta Plan

_____

*Dellate v. Great Neck Union Free Sch. Dist.*, No. 09-2567, 2010 WL 3924863, at \*8 (E.D.N.Y.
Sept. 30, 2010) (Tomlinson, M.J.); *see also Iqbal*, 129 S. Ct. at 1950 (doors of discovery not
unlocked by conclusory allegations).  Ultimately, the Second Amended Complaint does not
make any allegations regarding any such agreement between Moritt and Designs, written or
otherwise, and speculative statements in Plaintiffs' Opposition papers are not entitled to the
presumption of truth on a motion to dismiss.

participants." (*Id.* Ex. A, at 1 (emphasis added).)  Because the December 17, 2002 letter discusses those very disclosure issues[15] and is addressed to the sponsor—Designs—the logical implication is that the December 16, 2002 letter to BETA Plan participants enclosed the December 17, 2002 letter to Moritt.[16]  This is sufficient to satisfy the Court that it is plausible that Moritt intended both the December 16, 2002 and December 17, 2002 letters to be conveyed to Plaintiffs.

Moritt argues that, even if it intended that the letters be conveyed to Plaintiffs, the letters cannot support a fraud claim because they contain unactionable legal opinions, not misrepresentations of fact.  Moritt seems to suggest—incorrectly—that statements of opinion are *per se* unactionable.  While it is true that "statements that, in retrospect, were inaccurate or were too highly optimistic do not typically constitute material misstatements," *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 397 (S.D.N.Y. 2006) (collecting cases), Plaintiffs allege more than that here.  Plaintiffs do not allege merely that Moritt's opinions turned out to be wrong, but instead that Moritt did not actually believe its opinions when it communicated them. (*See, e.g.*, SAC ¶¶ 6 ("Moritt Hock knew that the IRS laws were not strong and that it was skating on thin ice by approving the BETA Plan, but Moritt Hock still represented to Class

---

[15]    Indeed, the December 17, 2002 letter notes that "[t]he issues we are responding to involve issuance of the Internal Revenue Service ('IRS') that were made during the period June-July 2002, involving temporary and proposed regulations that may apply to plans that qualify for the exemption from the rules of Section 419 and Section 419A, as provided in Section 419A(f)(6)." (Balla Decl. ISO Moritt Opp'n Ex. B, at 1.)  It concludes that the BETA Plan "bears no resemblance to the plans described in [the IRS notice], and therefore there is no need to file the Disclosure Statement." (*Id.* at 11.)

[16]    That the December 17, 2002 letter is dated one day later does not foreclose the possibility that it was enclosed with the December 16, 2002 letter, and, given that the letters discuss the same issues, the argument that it was enclosed with the December 16, 2002 letter is plausible.

Members that the Plan was legally permissible."), 63 ("Moritt Hock . . . fraudulently supported

the BETA Plan and reaffirmed the legality of the Plan to Plaintiffs . . . . while knowing that it did

not fulfill the requirements detailed by IRS Code §§ 419 & 419A . . . ."); *see also id.* ¶¶ 2, 31,

99.)  Such statements are indeed actionable as fraudulent misrepresentations.  *See Abu Dhabi*

*Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 176 (S.D.N.Y. 2009) (for New

York common-law fraud claim, "'[a]n opinion may still be actionable if the speaker does not

genuinely and reasonably believe it or if it is without basis in fact'") (quoting *In re IBM Corp.*

*Sec. Litig.*, 163 F.3d 102, 109 (2d Cir. 1998)); *see also Novak v. Kasaks*, 216 F.3d 300, 315 (2d

Cir. 2000) (defendants' statements that "the inventory situation was 'in good shape' or 'under

control' while they allegedly knew that the contrary was true" was more than mere puffery and

therefore actionable); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 239 (S.D.N.Y.

2006) ("[O]ptimistic statements may be actionable upon a showing that the defendants did not

genuinely or reasonably believe the positive opinions they touted (*i.e.*, the opinion was without a

basis in fact or the speakers were aware of facts undermining the positive statements), or that the

opinions imply certainty.").  While it will not be sufficient for Plaintiffs to prove that Moritt's

opinion was incorrect, and while Plaintiffs will be expected to provide the Court with evidence

during later stages of this litigation demonstrating that Moritt did not genuinely or reasonably

believe the opinions it expressed in its December 16, 2002 and December 17, 2002 letters,

Plaintiffs' allegations as described above are sufficient at this stage to state a claim for fraud.[17]

---

[17]    Moritt, unlike Designs, raises no statute of limitations argument with respect to the fraud-based claims, but I note that on the record before the Court, Plaintiffs plausibly allege that they discovered the fraud in March 2008 when Eaves received a letter from the IRS.  If so, the claim would be timely under N.Y. C.P.L.R. § 213(8), which requires that "an action based upon fraud . . . be commenced [within] . . . the greater of six years from the date the cause of action

I consider, finally, Plaintiffs' fraud claim against Prusky, which is based on Prusky's December 7, 2007 memorandum to Designs and "a legal opinion on July 13, 2005 further affirming the legitimacy of the BETA Plan." (SAC ¶ 70.)  The December 7, 2007 memorandum cannot support a fraud claim because, as explained above, Plaintiffs expressly disclaimed detrimental reliance on the memorandum when they admitted in their Second Amended Complaint that "not trusting Prusky's evaluation of the BETA Plan, Eaves refused to take the $40,000 contribution for 2007 as a tax deduction," and Cando therefore "suffered no fines for year 2007."  (*Id.* ¶ 57; *see id.* ¶ 36c ("Plaintiffs, after receiving Prusky's Sponsor Memos, attempted to discontinue their involvement in the Plan . . . ."); Pls.' Opp'n to Prusky at 2 ("Plaintiffs decided to stop making additional contributions once Prusky released its memo . . . .").)[18]  Plaintiffs' fraud claim must therefore be based on the July 13, 2005 legal opinion only.  Plaintiffs' allegations with respect to the legal opinion, however, fail to satisfy the pleading standards of Rule 9(b).  Plaintiffs provide no details regarding the contents of the legal opinion, (*see* SAC ¶ 70), and do not attach it to any of their pleadings, presumably because they do not have it.  Plaintiffs do not allege that they ever received the legal opinion, and the exhibits they attach to their Second Amended Complaint indicate that it was sent to Designs, not Plaintiffs.  (*See id.* Ex. D, at 9 ("[Designs] obtained legal opinions from . . . Byron R. Prusky, from Prusky Law Associates, P.C., dated July 13, 2005, regarding the Single Employer Plan."),

---

accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it."  N.Y. C.P.L.R. § 213(8).

[18]      Plaintiffs argue in their Opposition papers that they would have pulled out of the BETA Plan and paid back taxes had they not been misled by the December 7, 2007 memorandum, (Pls.' Opp'n to Prusky at 10), but no such allegation, or factual underpinning therefor, appears in the Second Amended Complaint.

10 ("Mr. Prusky's July 13, 2005, opinion letter to [Designs] states . . . .").)  I therefore dismiss

the fraud claim as to Prusky.

### 3.    Negligent Misrepresentation (Claim 9)

Plaintiffs assert negligent misrepresentation claims against all three defendants.  Under

New York law, a negligent misrepresentation claim must satisfy the following elements:

> (1) the defendant had a duty, as a result of a special relationship, to give correct
> information; (2) the defendant made a false representation that he or she should
> have known was incorrect; (3) the information supplied in the representation was
> known by the defendant to be desired by the plaintiff for a serious purpose; (4) the
> plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on
> it to his or her detriment.

*Hydro Investors, Inc. v. Trafalgar Power Inc*., 227 F.3d 8, 20 (2d Cir. 2000).

Defendants argue that Rule 9(b) applies to negligent misrepresentation claims.  The

Second Circuit has not explicitly ruled on whether such claims must satisfy Rule 9(b).  *See*

*Eternity Global*, 375 F.3d at 188 ("Rule 9(b) may or may not apply to a state law claim of

negligent misrepresentation").  As the Court noted in *Eternity*, however, a number of district

courts in this Circuit have required negligent misrepresentation claims to satisfy Rule 9(b).  *See*

*id.*; *see also Ebusinessware*, 2009 WL 5179535, at *13 (acknowledging that the Second Circuit

has left open the question of whether Rule 9(b) applies to negligent misrepresentation claims, but

nonetheless applying Rule 9(b) to the negligent misrepresentation claim at issue);  *DeBlasio v.*

*Merrill Lynch & Co., Inc.*, No. 07-0318, 2009 WL 2242605, at *12 (S.D.N.Y. July 27, 2009)

(same); *Welch v. TD Ameritrade Holding Corp.*, No. 07-6904, 2009 WL 2356131, at *23

(S.D.N.Y. July 27, 2009) (same).  Even if Rule 9(b) does not apply to all negligent

misrepresentation claims, in cases where, as here, the negligent misrepresentation claim is based

on the same set of facts as those upon which a fraud claim is grounded, Rule 9(b) applies to the

negligent misrepresentation claim as well.  *E.g.*, *Liberty Mut. Ins. Co. v. Luxury Transp. Mgmt. Inc.*, No. 07-0608, 2009 WL 1033177, at *7 n.9 (E.D.N.Y. Apr. 16, 2009); *In re Parmalat Secs. Litig.*, 479 F. Supp. 2d 332, 340 n.30 (S.D.N.Y. 2007).  In any event, Plaintiffs do not dispute Rule 9(b)'s applicability to their negligent misrepresentation claims.  As such, the Court applies it here.  *See, e.g.*, *Ebusinessware*, 2009 WL 5179535, at *13 (applying Rule 9(b) where counterclaim-plaintiff did not dispute rule's applicability).

I first consider Plaintiffs' negligent misrepresentation claim against Designs.  Given that both this claim and Plaintiffs' fraudulent inducement claim are subject to Rule 9(b) and require Plaintiffs to allege a misrepresentation by Designs and reasonable reliance thereon, the negligent misrepresentation claim is subject to the same analysis as laid out above.  Namely:  (1) Plaintiffs have not adequately alleged that the BETA Sales Packet constituted a representation by Designs; (2) Plaintiffs' allegations regarding marketing of the BETA Plan do not satisfy Rule 9(b); and (3) Plaintiffs have not alleged reasonable reliance on Designs' December 10, 2007 and April 9, 2008 letters.  I therefore dismiss this claim as to Designs.[19]

Plaintiffs' negligent misrepresentation claims against Moritt and Prusky, however, require a slightly different analysis.  Both Moritt and Prusky argue that they did not have a duty, as a result of a special relationship, to give correct information to Plaintiffs.  It is black letter law in New York that a party can assert a negligent misrepresentation claim against a professional only where there is either actual contractual privity or a relationship "'so close as to approach that of privity.'" *Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson*, 73 N.Y.2d 417, 424 (1989) (quoting *Ultramares Corp. v. Touche*, 255 N.Y. 170, 182–83 (1931)).  This rule has

---

[19]      Designs puts forth a statute of limitations argument as to the negligent misrepresentation claim, but I need not reach it in light of the disposition above.

been extended to negligent misrepresentation claims against attorneys.  *See Prudential Ins. Co. v. Dewey, Ballantine, Bushby, Palmer & Wood*, 80 N.Y.2d 377, 381 (1992).  Where, as here, actual contractual privity is lacking with the attorney, a plaintiff must allege the following:  "(1) an awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance."  *Id.* at 384 (citing *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 551 (1985)).[20]  "Applying these criteria, courts have held that an attorney owes fiduciary duties to a party other than his client only under the rarest of circumstances."  *Lewis v. Rosenfeld*, 138 F. Supp. 2d 466, 480 (S.D.N.Y. 2001).  "Indeed, such a holding is appropriate only when the attorney, at the client's request, issues an 'opinion letter' which the attorney knew would be relied on by a third party."  *Id.*  The law is clear, however, that for an attorney to be liable to a non-client third party based upon an opinion letter, the letter must urge or expressly authorize reliance thereon by the third party.  *See, e.g.*, *LNC Inv., Inc. v. First Fidelity Bank, Nat. Ass'n*, 935 F. Supp. 1333, 1351 (S.D.N.Y. 1996) (attorney liable "only when an attorney has furnished specific advice to a third party, when that advice was the 'end and aim' of the transaction, when the attorney intended the third party to rely on that advice, and when the third party's reliance thereon was foreseeable").

As noted above, the September 24, 2000 and August 12, 2003 letters from Moritt were both addressed from Moritt to Designs.  Although Plaintiffs allege in conclusory fashion that

---

[20]     Although Rule 9(b) applies to Plaintiffs' negligent misrepresentation claims, they need not allege these three factors with specificity.  *See ADL, LLC v. Tirakian*, 2010 WL 3925131, at *8 (E.D.N.Y. Aug. 26, 2010)

Moritt "knew or should have known" that Plaintiffs would rely upon its opinion letters, (*see, e.g.*, SAC ¶¶ 2, 99), with respect to these two letters, those allegations are undone by the above-quoted declaimer language, (*see id.* Ex. B, at 27; Balla Decl. ISO Moritt Opp'n Ex. C, at 4–5), expressly stating that Moritt's opinions were rendered only to Designs and were not intended to be relied upon BETA Plan participants.  Plaintiffs' negligent misrepresentation claims with respect to these letters must therefore be dismissed.  *See, e.g.*, *Doehla*, 1999 WL 566311, at *20 (negligent misrepresentation claim against attorney dismissed where "[m]issing from the complaint is any allegation suggesting that the purpose or the 'end and aim' of [the attorney's] engagement by the [client] was reliance by [plaintiff] on his alleged negligently furnished declarations" and the attorney "issued no opinion letter or report upon which [plaintiff] was urged to rely"); *Crossland Sav. FSB v. Rockwood Ins. Co.*, 700 F. Supp. 1274, 1282 (S.D.N.Y. 1988) ("[T]he attorney owes a duty to the third party if the opinion letter is either addressed to the third party or expressly authorizes his reliance."); *cf. Vereins-Und Westbank, AG v. Carter*, 691 F. Supp. 704, 706, 716 (S.D.N.Y. 1988) (denying summary judgment and sustaining plaintiff's negligent misrepresentation claim against attorney because client expressly instructed attorney to prepare opinion letter for third party, and letter expressly stated "[t]his opinion may be relied upon by [third party] and its assignee").

Plaintiffs may, however, proceed with their negligent misrepresentation claim based upon Moritt's December 16, 2002 and December 17, 2002 letters.  As noted above, the December 16, 2002 letter to BETA Plan participants notes that it encloses the December 17, 2002 letter to Designs.  As both letters were directed to BETA Plan participants, the plan participants' reliance thereon was clearly the "end and aim" of such letters, and they are sufficient to support a negligent misrepresentation claim as to Moritt.  *See, e.g.*, *Meranus v. Gangel*, No. 85-9313, 1989

WL 240072, at**3–4 (S .D.N.Y. Aug. 10, 1989) (sustaining third-party negligent misrepresentation claim against partnership's law firm that was alleged to have issued inaccurate tax opinions in connection with numerous deals by partnership); *Prudential Ins. Co.*, 80 N.Y.2d at 385 (law firm owed duty of care to third party in issuing opinion letter where law firm knew "end and aim" of opinion was use by third party in determining whether to permit client's debt restructuring). Moritt also argues that the letters are not actionable as statements of opinion, but, as discussed above, statements of opinion may support a fraud claim when a plaintiff alleges that the defendant did not genuinely or reasonably believe the opinions at the time the defendant made them. This principle applies to negligent misrepresentation claims as well. *See, e.g.*, *In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09-MD-2030, 2011 WL 536437, at *12 (S.D.N.Y. Feb. 9, 2011). Plaintiffs therefore sufficiently state a negligent misrepresentation claim as to Moritt's December 16, 2002 and December 17, 2002 letters.[21]

Plaintiffs' negligent misrepresentation claim against Prusky, however, must be dismissed for the reasons stated in connection with the fraud claim: Plaintiffs expressly disclaim detrimental reliance on the December 7, 2007 memorandum, and their allegations with respect to the July 13, 2005 legal opinion fail to satisfy Rule 9(b).

---

[21] Moritt does not put forth a statute of limitations argument as to this claim, but because the statute of limitations here is the same as for the fraud-based claims, *see Fed. Ins. Co. v. Distinguished Props. Umbrella Managers Inc.*, 721 F. Supp. 2d 293, 297 n.1 (S.D.N.Y. 2010) ("[U]nder New York law, a six-year statute of limitations applies to negligent misrepresentation claims based on fraud."); *Von Hoffman v. Prudential Ins. Co. of Am.*, 202 F. Supp. 2d 252, 263–64 (S.D.N.Y. 2002) (two-year discovery rule applies), the analysis above with respect to Plaintiffs' fraud claim against Moritt applies with equal weight here.

### 4.      Civil Conspiracy (Claim 10)

Plaintiffs assert claims for civil conspiracy against all three defendants.  "Under New York law, there is no independent tort for conspiracy.  All that an allegation of conspiracy can accomplish is to connect nonactors, who otherwise might escape liability, with the acts of their coconspirators."  *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, No. 09-3655, 2010 WL 5222125, at *19 (S.D.N.Y. Dec. 21, 2010) (citation omitted).  Therefore, to establish a claim for civil conspiracy, a plaintiff must first demonstrate an underlying tort upon which the conspiracy may be based.  *Id.*  Plaintiffs argue that their civil conspiracy claim is based on the underlying torts of fraud and negligent misrepresentation.  (*See* Pls.' Opp'n to Designs at 18; Pls.' Opp'n to Moritt at 24; Pls.' Opp'n to Prusky at 22.)  The law is clear, however, that while a fraud may serve as the underlying tort for a civil conspiracy claim, negligence may not.  *See, e.g.*, *Drake v. Lab. Corp. of Am. Holdings*, No. 02-1924, 2007 WL 776818, at *6 (E.D.N.Y. Mar. 13, 2007) ("'Since a civil conspiracy cause of action requires a showing of intentional conduct, negligence cannot serve as the underlying tort.'") (quoting *Rosen v. Brown & Williamson Tobacco Corp.*, 782 N.Y.S.2d 795, 795 (2d Dep't 2004)).  Because Plaintiffs' fraud claim against Moritt is the only surviving tort claim, it functions as the sole basis for Plaintiffs' civil conspiracy claim.

To establish a claim of civil conspiracy, Plaintiffs "must demonstrate the underlying tort, plus the following four elements:  (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a common purpose or plan; and, (4) resulting damage or injury."  *IMG Fragrance Brands, LLC*, 2010 WL 5222125, at *19.  Plaintiffs have sufficiently pleaded a conspiracy to defraud between Designs and Moritt.  They have properly pleaded an agreement between the parties by alleging, *inter alia*, that "Designs created the BETA Plan knowing that it would not be approved directly

31

by the IRS in a private letter ruling and sought the opinion of Moritt Hock for a favorable

interpretation of the law relevant to the BETA Plan," (SAC ¶ 31), and that "Moritt Hock, as

counsel specifically hired by Designs to market and affirm the legitimacy of the BETA Plan,

wrote a fifty-four page document to Designs . . . falsely endorsing the BETA Plan," (*id.* ¶ 66).

*See, e.g.*, *First Fed. Sav. & Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon & Co.*, 629 F.

Supp. 427, 444 (S.D.N.Y. 1986) (allegations of "intimate business relationship between"

defendant and third-party, "[defendant's] knowledge of [third party's] unlawful acts," and

fraudulent misrepresentations "constitute sufficient facts from which a trier of fact could infer an

agreement").   Moreover, the Second Amended Complaint alleges intentional participation in

furtherance of the conspiracy, as well as multiple overt acts, in the form of various letters and

opinions written by both parties with respect to the legal and/or financial viability of the BETA

Plan.  (*See, e.g.*, SAC ¶¶ 2, 31, 36b, 39, 47–49, 67, 69–70, 98, 100.)  Plaintiffs have not,

however, demonstrated a conspiracy between Moritt and Prusky, as the Second Amended

Complaint alleges no contact or interaction whatsoever between the two law firms.  I therefore

deny Defendants' motions to dismiss the civil conspiracy claims as to a conspiracy between

Designs and Moritt in connection with fraud by Moritt, but grant the motions to dismiss the

claims in all other respects.

> ### 5.  Breach of Contract (Claim 2) and Breach of the Implied Duty of Good Faith and Fair Dealing (Claim 3)

Plaintiffs assert claims for breach of contract and breach of the implied duty of good faith

and fair dealing against Designs.  Both claims require Plaintiffs to adequately allege the

existence of a contract.  *See, e.g.*, *Serdarevic v. Centex Homes, LLC*, No. 08-5563, 2010 WL

5608795, at **6, 8 (S.D.N.Y. Sept. 30, 2010); *Davidowitz v. Patridge*, No. 08-6962, 2010 WL 1779279, at *5 n.6 (S.D.N.Y. Apr. 23, 2010).[22]  Plaintiffs, however, fail to do so.

Plaintiffs offer only vague and conclusory allegations as the an agreement between themselves and Designs:

- "Eaves entered Cando in the multiple employer benefit BETA Plan in or around 2001."  (SAC ¶ 8.)

- "After reading through the BETA Sales Packet endorsed by Designs . . . Plaintiffs decided to enroll in the BETA Plan in October 2001."  (*Id.* ¶ 40.)

- "Plaintiffs . . . purchase[d] and continue[d] contributing to the BETA Plan." (*Id.* ¶ 68.)

- "Plaintiffs and Class Members . . . entered into a contract with Designs and placed their money in the BETA Plan established by Designs."  (*Id.* ¶ 84.)

- "Plaintiffs and Class Members entered into contracts with Designs for the provisions of the BETA Plan described above, pursuant to which Plaintiffs and Class Members were to receive tax deductions for their contributions to the BETA Plan and tax free income upon retirement."  (*Id.* ¶ 89.)

Plaintiffs fail to provide facts regarding any specific contract between the parties, how or when such contract was formed, or any terms of the contract(s) at issue.  It is unclear, for instance, if their breach of contract or breach of the implied duty of good faith and fair dealing claims pertain to their 2001 enrollment in the MEP version of the BETA Plan, their 2003 enrollment in the SEP version of the BETA Plan, or both.  They do not even identify any documents that were

---

[22]     The remaining elements of a breach of contract claim are "the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages."  *Serdarevic*, 2010 WL 5608795, at *6 (internal quotation marks omitted).  Meanwhile, "a party may be in breach of an implied duty of good faith and fair dealing, even if it is not in breach of its express contractual obligations, when it exercises a contractual right as part of a scheme to . . . deprive the other party of the fruit of its bargain."  *Duration Mun. Fund, L.P. v. J.P. Morgan Sec. Inc.*, 899 N.Y.S.2d 59 (Table), No. 603486-2008, 2009 WL 2999201, at *6 (Sup. Ct. N.Y. Cnty. Sept. 16, 2009).

actually signed during those enrollments, much less specify which documents and which provisions of those documents Designs allegedly breached.  Such omissions are fatal to Plaintiffs' claims.  *See, e.g.*, *Owens v. Gaffken & Barriger Fund, LLC*, No. 08-8414, 2009 WL 3073338, at *14 (S.D.N.Y. Sept. 21, 2009) (existence of contract insufficiently alleged where "[t]he complaint [did] not allege or explain how the Operating Agreement became a valid and binding contract between the plaintiff and any defendant" and "fail[ed] to cite to any specific contractual provisions alleged to have been breached"); *Abu Dhabi Commercial Bank*, 651 F. Supp. 2d at 183–84 (existence of contract insufficiently alleged where plaintiffs "fail[ed] to provide any facts about how this contract was formed, the date of formation, the consideration, or the contract's major terms," "fail[ed] to plead that the defendants intended to create a binding contract," and failed to plead "any facts indicating how plaintiffs accepted these promises"); *Posner v. Minn. Mining & Mfg. Co.*, 713 F. Supp. 562, 563–64 (E.D.N.Y.1989) (dismissing breach of contract claim, even under the more lenient standard for *pro se* plaintiffs, where "plaintiffs fail to set forth any specific information as to when the agreement was made, the terms of the agreement upon which liability is predicated, or any other evidence supporting the formation of an agreement").

The Second Amended Complaint instead focuses on the BETA Plan—a document separate and distinct from any enrollment or adoption agreement, (*see* Richan Decl. Ex. E)—and the BETA Sales Packet—a document Plaintiffs allege Designs "sponsored" in order to induce them to adopt the BETA Plan.  But allegations regarding other documents cannot substitute for allegations regarding the contract that has allegedly been breached.  Neither can allegations regarding Designs' representations, whether in marketing materials or otherwise, concerning the nature of the Plan or its legal viability.  Moreover, it is unclear from the Second Amended

Complaint whether the misrepresentations to which Plaintiffs point—namely, that the BETA Plan was a legitimate welfare benefit plan under which tax deductions were permissible, rather than an illegal tax shelter—were even contained in the alleged contract, or whether they were merely extrinsic statements made to induce Plaintiffs to enter the alleged contract.  To the extent Plaintiffs allege that the misrepresentations were merely extrinsic statements, their contract claim is "nothing more than a regurgitation of the[ir] fraud claim."  *Salzmann v. Prudential Sec., Inc.*, No. 91-4253, 1994 WL 191855, at *8 (S.D.N.Y. May 16, 1994) ("[T]he Amended Complaint . . . only alleges that the defendants made these representations in order to induce the plaintiffs to sign the written contract.  There is no specific allegation that these representations were part of a contract or that they form a separate collateral agreement. Thus, the claim is actually one for fraud and not for a contractual breach, and it thereby fails to state a claim upon which relief can be granted.") (citation omitted).

Further, even if there were a contract, Plaintiffs' failure to detail its terms means they cannot establish either that Designs breached an obligation under that contract, as required for a breach of contract claim, *see, e.g.*, *Abu Dhabi Commercial Bank*, 651 F. Supp. 2d at 183 ("For a breach of contract claim, [p]laintiff must provide specific allegations as to . . . what provisions of the agreement were breached as a result of the acts at issue.") (alteration in original) (internal quotation marks omitted), or that Designs' conduct prevented Plaintiffs from obtaining the benefits of the contract, as required for a breach of the implied duty of good faith and fair dealing claim, *see, e.g.*, *Duration Mun. Fund, L.P.*, 2009 WL 2999201, at *6 ("[A] party may be in breach of an implied duty of good faith and fair dealing . . . when it exercises a contractual right

as part of a scheme to . . . deprive the other party of the fruit of its bargain.").  These claims must therefore be dismissed.[23]

### 6.    Breach of Fiduciary and Co-fiduciary Duties under ERISA (Claim 5)

Plaintiffs assert a claim for breach of fiduciary and co-fiduciary duties against all three defendants.  To state a claim for breach of fiduciary duty under ERISA, a plaintiff must, at a minimum, allege "1) that the defendant was a fiduciary who, 2) was acting within his capacity as a fiduciary, and 3) breached his fiduciary duty."  *In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d 345, 353 (S.D.N.Y. 2009) (citing 29 U.S.C. § 1109; *In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*, No. 02-8853, 2005 WL 563166, at *3 (S.D.N.Y. Mar. 10, 2005)).  "ERISA liability arises only from actions taken or duties breached in the performance of ERISA obligations."  *In re Worldcom, Inc. ERISA Litig.*, 263 F. Supp. 2d 745, 760 (S.D.N.Y. 2003) (citing *Pegram v. Herdrich*, 530 U.S. 211, 225–26 (2000); *Varity Corp. v. Howe*, 516 U.S. 489,

---

[23]    Designs argues that the breach of the implied duty of good faith and fair dealing claim is duplicative of the breach of contact claim and must be dismissed on that ground.  I note that although New York law does not recognize a separate claim for breach of the implied duty of good faith and fair dealing based on the same facts as a claim for breach of contract, *see MBIA Ins. Co. v. GMAC Mortg. LLC,* 914 N.Y.S.2d 604, 611 (Sup. Ct. N.Y. Cnty. 2010), alternative pleading of contradictory claims is explicitly allowed under the Federal Rules of Civil Procedure, *see* Fed. R. Civ. P. 8(d)(2), and "[a] claim for breach of contract does not preclude a party from bringing a claim for breach of the implied covenant of good faith and fair dealing when they are brought in the alternative," *Fantozzi v. Axsys Techs., Inc.*, No. 07-02667, 2008 WL 4866054, at *7 (S.D.N.Y. Nov. 6, 2008).  In any event, Plaintiffs' failure to adequately allege the existence of a contract moots this question.

Designs also raises a statute of limitations argument with respect to both claims.  The limitations period for both claims is six years from the time of the breach.  *See* N.Y. C.P.L.R. § 213(2); *Ely-Cruikshank Co., Inc. v. Bank of Montreal*, 81 N.Y.2d 399, 403 (1993) (applying six-year limitations period to claim for breach of implied duty of good faith and fair dealing).  As Plaintiffs do not adequately allege when the breach occurred, I am unable to conclude when the limitations period started running.  Regardless, this question, too, is mooted by Plaintiffs' failure to adequately allege the existence of a contract or the terms thereof.

500 (1996)). "In every case charging breach of ERISA fiduciary duty, then, the threshold question is . . . whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram*, 530 U.S. at 226. A person acts as a fiduciary when he or she "'fulfill[s] certain defined functions, including the exercise of discretionary authority or control over plan management or administration.'" *Mahoney v. J.J. Weiser & Co., Inc.*, 564 F. Supp. 2d 248, 255 (S.D.N.Y. 2008) (quoting *Siskind v. Sperry Ret. Program, Unisys*, 47 F.3d 498, 505 (2d Cir. 1995)).

Plaintiffs allege that Designs functioned as the BETA Plan sponsor, having "created and primarily advocated for the Plan." (SAC ¶ 2.) "As a matter of law . . . Plan sponsors are not ERISA fiduciaries, unless specifically designated in the Plan . . . ." *In re AOL Time Warner*, 2005 WL 563166, at *4 (citing *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996)). The BETA Multiple Employer Death Benefit Plan and Trust—the document establishing the plan—does not designate Designs as a fiduciary. The only fiduciaries designated therein are the plan's Trustee, Administrator, and Recordkeeper, as well as any entity the Administrator designates for the purposes of "determining eligibility for participation and Benefits appeals with respect to denied claims for benefits." (Richan Decl. Ex. E ¶ 5.1.) Moreover, the plan notes that "[t]he authority of each named fiduciary in its designated area of responsibility . . . shall be exclusive, and no person shall have either authority or responsibility to exercise any discretion or control other than as specifically delegated to the person hereunder." (*Id.*) Plaintiffs do not allege that Designs was designated as a fiduciary elsewhere in the plan document, or that Designs was designated as a fiduciary by the Administrator for the purposes of determining eligibility or administering benefits appeals.

37

Plaintiffs allege in conclusory fashion that "[u]pon information and belief, Defendants owed a fiduciary duty to Plaintiffs and Class Members providing management services and financial advice with respect to disposition of funds of the Plan." (SAC ¶ 116.)  Nothing in the Second Amended Complaint, however, suggests that Designs had discretionary authority over plan management or the investment or disposition of plan funds.  Instead, the Second Amended Complaint focuses exclusively upon Designs' creation of the BETA Plan and its modification of the plan's structure.  (*See id.* ¶¶ 2, 16, 31, 34–36, 43, 54–55, 63, 66, 69, 75.)  The law is clear that these do not constitute fiduciary functions.  *See Lockheed*, 517 U.S. at 890 (when plan sponsors act to adopt, modify, or terminate an ERISA plan, they act as do settlors of a trust and do not fall into the category of fiduciaries).  Plaintiffs' ERISA claim as to Designs is therefore not plausible on its face, and must be dismissed.

Plaintiffs' ERISA claims against Moritt and Prusky stand on even shakier ground.  As the Second Circuit has explained,

> [A]n attorney, accountant, actuary or consultant who renders legal, accounting, actuarial or consulting services to an employee benefit plan . . . [is not] a fiduciary to the plan solely by virtue of the rendering of such services, absent a showing that such consultant (a) exercises discretionary authority or discretionary control respecting the management of the plan, (b) exercises authority or control respecting management or disposition of the plan's assets, (c) renders investment advice for a fee, direct or indirect, with respect to the assets of the plan, or has any authority or responsibility to do so, or (d) has any discretionary authority or discretionary responsibility in the administration of the plan.

*F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1259–60 (2d Cir. 1987) (alterations in original) (quoting 29 C.F.R. § 2509.75-5).  As to Moritt and Prusky, Plaintiffs offer the same conclusory allegation regarding the provision of management services and financial advice as indicated above.  (SAC ¶ 116.)  Plaintiffs, however, allege no facts supporting the inference that Moritt or Prusky had discretionary authority or control over the management or

38

administration of the plan.  *See, e.g.*, *Acosta v. Pace Local I-300 Health Fund*, No. 04-3885, 2007 WL 496877, at **8–9 (D.N.J. Feb. 9, 2007) (conclusory claims that lawyer acted as fiduciary for ERISA purposes did not state a claim upon which relief could be granted).  Instead, the Second Amended Complaint focuses exclusively upon Moritt's and Prusky's opinions concerning the legal viability of the BETA Plan.  (*See id.* ¶¶ 2, 16, 31, 36, 39, 48–51, 63, 66–67, 69–70, 78.)  These allegations merely demonstrate that Moritt's and Prusky's services were typical of those provided by legal counsel, and do not suggest that they crossed the threshold from legal counsel to fund fiduciaries.  *See, e.g.*, *Ello v. Singh*, 531 F. Supp. 2d 552, 566 (S.D.N.Y. 2007) (dismissing ERISA claim against law firm because "Plaintiff's conclusory allegations merely portray [the law firm] as a zealous advocate for the Fund," and "[t]he allegations in the [complaint] fall far short of claiming that [the law firm] had discretionary authority or control over the Fund; that [the law firm] managed Fund assets; rendered investment advice; or had discretionary authority or responsibility over the administration of the Fund"); *Agway, Inc., Emps.' 401(k) Thrift Inv. Plan v. Magnuson*, No. 03-1060, 2006 WL 2934391, at *25 (N.D.N.Y. Oct. 12, 2006) (dismissing ERISA claim where the amended complaint's allegations "implicate[d] the type of services ordinarily rendered by independent, outside auditors" and "[n]owhere does plaintiff's amended complaint assert that [defendant] possessed the power to make decisions regarding Plan assets, nor do plaintiffs aver that through their conduct as auditors, [defendant] intended to entice fiduciaries of the Plan to breach their duties, or to engage in prohibited transactions"); *cf. Carpenters' Local Union No. 964 Pension Fund v. Silverman*, No. 93-8787, 1995 WL 378539, at *3 (S.D.N.Y. June 26, 1995) (sustaining ERISA claim against attorney where complaint alleged that attorney "was a trustee [and] an insider," that the "Fund's investment advisor[] furnished information relating to proposed transactions" to

the attorney, and the attorney "reviewed such information relating to proposed [investment] transactions and approved the transactions . . . as investments for the Fund").

In their Opposition papers, Plaintiffs seize upon their conclusory allegations and argue that Moritt and Prusky should be considered fiduciaries because they rendered investment advice. (Pls.' Opp'n to Moritt at 14; Pls.' Opp'n to Prusky at 11–12.) The opinion letters and memoranda, however, do not demonstrate that the law firms rendered advice regarding the investment of assets *by the BETA Plan*—and, in any event, Plaintiffs do not allege facts to support that conclusion. The only investment advice alleged is that concerning *plan participants' investment in the BETA Plan*, (*see, e.g.*, SAC ¶ 144), which is insufficient to confer fiduciary status—and even those allegations derive from a strained reading of the opinion letters and memoranda. Plaintiffs' Second Amended Complaint therefore falls short of alleging that Moritt and Prusky were fiduciaries, and the claims must be dismissed.

### 7.    RICO (Claim 6)

Plaintiffs assert civil RICO claims against all three defendants. Specifically, Plaintiffs allege that "Defendants participated in, directly or indirectly, the conduct of the affairs of the BETA Plan through a pattern of racketeering activity . . . and therefore violated 18 U.S.C. § 1962(c)." (*Id.* ¶ 126.) Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). Plaintiffs' RICO claims must fail because, at a minimum, they fail to adequately plead a RICO enterprise and a pattern of racketeering.

A RICO "enterprise" is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Id.* § 1961(4).  As the Supreme Court has explained,

> The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. . . . [It] is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. . . . The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages.  The existence of an enterprise at all times remains a separate element which must be proved . . . .

*United States v. Turkette*, 452 U.S. 576, 583 (1981); *accord First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004).  Plaintiffs merely allege in conclusory fashion that "Defendants, through the BETA Plan, engaged in an 'enterprise.'"  (SAC ¶ 125.)  But they fail to allege any details regarding the hierarchy or organization of the alleged enterprise, or to advance any facts suggesting that the constituent members of the alleged enterprise functioned as a unit.  Ultimately, the Second Amended Complaint does not allege that Defendants existed as an association-in-fact separate and apart from the alleged RICO activity, but rather that came together strictly for the purpose of creating these allegedly fraudulent tax shelters.  The lack of a separate enterprise is fatal to the RICO claims.  *See Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 459 (S.D.N.Y. 2009) (dismissing RICO claim in fraudulent tax shelter case because "allegations in the Amended Complaint fall short of alleging a RICO enterprise that existed separate and apart from any pattern of racketeering activity in which the Defendants and co-conspirators engaged," and finding that "[t]he enterprise and the pattern in this case are one and the same; Defendants and co-conspirators joined forces for the purpose of creating these allegedly fraudulent tax shelters and Plaintiffs seem to concede as much in their opposition to this motion to dismiss:  '[Defendants] entered into a formal operating agreement with respect to

41

the sale and promotion of unlawful tax shelters . . . Furthermore, [Defendant] used its

contacts . . . to solicit and discuss their essential participation in the fraudulent scheme.'") (third

alteration in original); *see also Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F.

Supp. 2d 514, 539 (S.D.N.Y. 2001) (dismissing RICO claim where plaintiff merely listed

members of alleged enterprise and alleged that they were "combined in an association-in-fact";

plaintiff "failed to present specific details of any hierarchy, organization, or unity among the

various alleged conspirators," and "conclusory naming of a string of entities [did] not adequately

allege an enterprise") (internal quotation marks omitted); *First Nationwide Bank v. Gelt Funding,*

*Corp.*, 820 F. Supp. 89, 97–98 (S.D.N.Y. 1993) (dismissing RICO claim where plaintiff alleged

that "at various times as early as 1985, and possibly earlier . . . defendants were associated in fact

for the common purpose, among others, of defrauding [plaintiff] through the loan transactions

described in this complaint and other means" and that "[t]his association in fact was an

'enterprise,'" and stating that "[c]onclusory allegations that disparate parties were associated in

fact . . . are insufficient to sustain a RICO claim, absent allegations as to how the members were

associated together in an 'enterprise'"), *aff'd*, 27 F.3d 763 (2d Cir. 1994); *Bernstein v. Misk*, 948

F. Supp. 228, 235 (E.D.N.Y. 1997) (conclusory allegations that "defendants and each of them are

members, or associates of members, of the [Queens Surgical Community Center], the Lab, and

the various nominee entities described above, an association-in-fact" did not sufficiently describe

an "organization whose various associates function as a continuing unit") (emphasis omitted)

(internal quotation marks omitted).

     An alternate ground for dismissal is Plaintiffs' failure to plead a sufficient pattern of

racketeering activity.  Under the RICO statute, a "pattern of racketeering activity" requires the

commission of at least two predicate offenses within ten years of one another.  18 U.S.C.

§ 1961(5); *see Zito v. Leasecomm Corp.*, No. 02-8074, 2004 WL 2211650, at *6 (S.D.N.Y. Sept. 30, 2004). Plaintiffs allege that Defendants' pattern of racketeering activity consisted of numerous instances of theft or embezzlement from an employee benefit plan, in violation of 18 U.S.C. § 664,[24] mail fraud in violation of 18 U.S.C. § 1341,[25] and wire fraud in violation of 18 U.S.C. § 1343.[26] (SAC ¶ 127.) *See* 18 U.S.C. § 1961(1) ("racketeering activity" includes "any act which is indictable under," among other statutory sections, 18 U.S.C. §§ 664, 1341, and 1343). Where, as here, the alleged predicate acts for a RICO claim are mail fraud, wire fraud, and/or theft or embezzlement from an employee benefit plan, the plaintiff must plead the predicate acts with particularity under Rule 9(b). *See S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633–34 (2d Cir. 1996) (circumstances constituting mail and wire fraud must be pled in accordance with Rule 9(b)); *Am. Med. Ass'n v. United Healthcare Corp.*, 588 F. Supp. 2d 432, 444 (S.D.N.Y. 2008) (Rule 9(b) extends to predicate acts based on 18 U.S.C. § 664). Plaintiffs' allegations as to a pattern of racketeering activity fail because Plaintiffs allege only one sufficient predicate act. As discussed above in connection with the

---

[24]     Section 664 makes it illegal to "embezzle[], steal[], or unlawfully and willfully abstract[] or convert[] to [one's] own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan." 18 U.S.C. § 664.

[25]     Section 1341 makes it illegal for any person "having devised or intending to devise any scheme or artifice to defraud, . . . for the purpose of executing such scheme or artifice or attempting so to do, [to] place[] in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service." 18 U.S.C. § 1341.

[26]     Section 1343 makes it illegal for any person "having devised or intending to devise any scheme or artifice to defraud . . . [to] transmit[] or cause[] to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343.

fraud claims, the only documents conceivably supporting a mail or wire fraud predicate are

Moritt's December 16, 2002 and December 17, 2002 letters, which were sent together.[27]  They

would therefore constitute but a single mailing or wiring.  Further, although Plaintiffs claim that

the pattern of racketeering activity also included violations of 18 U.S.C. § 664, they do not say

what conduct might constitute a violation of that statute, and the facts they allege elsewhere in

the Second Amended Complaint do not support the notion that anybody stole from the BETA

Plan.  A passing reference to Section 664, devoid of factual support, does not pass muster under

Rule 8's pleading standards or Rule 9(b).  Accordingly, the RICO claim is dismissed.[28]

### 8.  N.Y. General Business Law § 349 (Claim 7)

Plaintiffs assert claims under New York General Business Law Section 349 against all

Defendants.  The elements of a claim under Section 349 are as follows:  "(1) the defendant's

challenged acts or practices must have been directed at consumers, (2) the acts or practices must

have been misleading in a material way, and (3) the plaintiff must have sustained injury as a

result."  *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007).  That a

defendant's acts have been "directed at consumers" means not that "the defendant committed the

complained-of acts repeatedly—either to the same plaintiff or to other consumers—but

instead . . . that the acts or practices [had] a broader impact on consumers at large."  *Oswego*

---

[27]     Arguably, even these do not support a mail or wire fraud predicate because Plaintiffs do
not say if the letters were sent by mail, wire, or otherwise.

[28]     Designs and Moritt raise statute of limitations arguments with respect to Plaintiffs' RICO
claims.  Civil RICO claims are subject to a four-year statute of limitations, and, as with the
accrual dates identified above in connection with other claims, the limitations period for a RICO
claim accrues when a plaintiff "discovers or should have discovered the RICO injury."  *World
Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 524 (S.D.N.Y. 2007) (internal
quotation marks omitted), *aff'd*, 328 F. App'x 695 (2d Cir. 2009).  I need not reach the issue in
light of my dismissal of the RICO claims on other grounds.

*Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995).  To show that the acts complained of were materially misleading, a plaintiff must show that the acts were "likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Id.* at 26.

"Generally, claims under the statute are available to an individual consumer who falls victim to misrepresentations made by a seller of consumer goods through false or misleading advertising."  *Small v. Lorillard Tobacco Co., Inc.*, 94 N.Y.2d 43, 55 (1999).  Courts have repeatedly held that "a consumer, for § 349 purposes, is one who purchase[s] goods and services for personal, family or household use."  *Exxonmobil Inter-Am., Inc. v. Advanced Info. Eng'g Servs., Inc.*, 328 F. Supp. 2d 443, 448 (S.D.N.Y. 2004) (alteration in original) (internal quotation marks omitted); *see Cruz v. NYNEX Info. Res.*, 703 N.Y.S.2d 103, 106 (1st Dep't 2000) ("In New York law, the term 'consumer' is consistently associated with an individual or natural person who purchases goods, services or property primarily for 'personal, family or household purposes.'") (citation omitted).  Thus, New York courts have generally found that "when the activity complained of involves the sale of commodities to business entities only, such that it does not directly impact consumers, section 349 is inapplicable."  *Shema Kolainu-Hear Our Voices v. Providersoft, LLC*, No. 09-3140, 2010 WL 2075921, at *7 (E.D.N.Y. May 21, 2010); *see Exxonmobil*, 328 F. Supp. 2d at 449 ("Contracts to provide commodities that are available only to businesses do not fall within the parameters of § 349.").

Plaintiffs' claims under Section 349 must fail, as Plaintiffs themselves allege throughout the Second Amended Complain that the BETA Plan was marketed exclusively to small businesses and their owners, rather than consumers at large:

- "The BETA Plan was specifically marketed to small businesses like Cando and their owners, like Eaves . . . ."  (SAC ¶ 4.)

- "Designs specifically marketed the Plan to small businesses like Cando, and their owners, like Eaves . . . ."  (*Id.* ¶ 66.)

- "In their misrepresentations, Designs, Moritt Hock, and Prusky directed their marketing toward all clients, including Eaves and Cando, seeking an IRS-approved tax shelter for small businesses . . . ."  (*Id.* ¶ 71.)

- "By marketing to small businesses and their owners, Defendants knew that . . . the resulting split-dollar life insurance relationship would make Plaintiffs and Class Members liable to IRS audit."  (*Id.* ¶ 77.)

- "Defendants engaged in the practice of advertising, promoting, and selling the BETA Plan by making representations to small businesses and their owners . . . ." (*Id.* ¶ 135.)

(*See also id.* ¶¶ 1–3, 18, 24, 32, 37, 67, 72–73 (allegations referencing small businesses).)  To be sure, a business plaintiff may state a claim under Section 349 where it demonstrates that the "defendant's deceptive conduct is, at least to some extent, directed at non-business consumers." *Spirit Locker, Inc. v. EVO Direct, LLC*, 696 F. Supp. 2d 296, 304 (E.D.N.Y. 2010).  Indeed, the New York Court of Appeals in *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, found that pension fund plaintiffs alleging that a defendant bank misrepresented its savings account policies were able to satisfy the "consumer-oriented" prong of a Section 349 claim.  85 N.Y.2d at 26–27.  Although the plaintiffs there were not typical consumers as defined by Section 349, the defendant bank had dealt with the "plaintiffs' representative as any customer entering the bank to open a savings account, furnishing the Funds with standard documents presented to customers upon the opening of accounts."  *Id.* at 26.  The instant case does not present an analogous situation.  Plaintiffs' allegations here are premised on Defendants' marketing of a welfare benefit plan specifically designed for the purpose of financing businesses' insurance costs for their employees.  By its very nature, the BETA Plan is not a product for

46

"personal, family or household use" and the deceptive conduct alleged by Plaintiffs was not directed at non-business consumers. On this same rationale, courts have dismissed Section 349 claims premised on other such business-only products and services. *See, e.g.*, *Dollar Phone Corp. v. Dun & Bradstreet Corp.*, No. 09-3645, 2010 WL 5313737, at **4–5 (E.D.N.Y. Sept. 2, 2010) (credit reports for small businesses), *report and recommendation adopted*, 2010 WL 5313757 (E.D.N.Y. Dec. 20, 2010); *Shema Kolainu-Hear Our Voices*, 2010 WL 2075921, at *8 (software product marketed only to subset of not-for-profit corporations); *Spirit Locker*, 696 F. Supp. 2d at 302–04 (credit card processing services for businesses); *Exxonmobil*, 328 F. Supp. 2d at 449–50 (customized installation and implementation of "Automatic Vehicle Location" system for oil trucks); *Citipostal, Inc. v. Unistar Leasing*, 724 N.Y.S.2d 555, 558–59 (4th Dep't 2001) ("business rather than consumer leases" of mobile communications equipment); *Cruz*, 703 N.Y.S.2d at 106–07 (sale of advertisement space in the Yellow Pages).[29] Plaintiffs' Section 349 claims must therefore be dismissed.[30]

---

[29]     Eaves' status as a small business owner, *i.e.*, an individual rather than a business entity, does not render Plaintiffs' claim consumer-oriented, absent allegations that the BETA Plan was marketed to consumers at large. *See Dollar Phone*, 2010 WL 5313737, at *4; *see also Sheth v. New York Life Ins. Co.*, 709 N.Y.S.2d 74, 75 (1st Dep't 2000) (practices directed at prospective insurance agents not consumer-oriented).

[30]     Section 349 also requires Plaintiffs to allege that "the transaction in which they were deceived occurred in New York." *Pentair Water Treatment (OH) Co. v. Continental Ins. Co*., No. 08-3604, 2009 WL 1119409, at *4 (S.D.N.Y. Apr. 26, 2009); *see Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 325–26 (2002) (while allegedly deceptive scheme was "conceived and orchestrated in New York," plaintiff "received [the] information in Florida" and "purchased his policy and paid his premiums in Florida, through a Florida insurance agent," and so "[p]lainly, for purposes of section 349, any deception took place in Florida, not New York"). Assuming for the sake of argument that Plaintiffs are consumers for the purposes of Section 349, they do not appear to adequately allege that the deception took place in New York: Eaves is resident of Colorado, and Cando is located in Florida, (SAC ¶¶ 8–9); the allegedly deceptive

### 9.      Conversion (Claim 8)

In the Second Amended Complaint, Plaintiffs asserted conversion claims against all three Defendants.  In their Opposition papers, Plaintiffs indicate that they are withdrawing their conversion claims against Designs and Moritt.  (*See* Pls.' Opp'n to Designs at 2; Pls.' Opp'n to Moritt at 2.)  Accordingly, those claims are hereby dismissed.  Curiously, however, Plaintiffs do not drop their conversion claim against Prusky.  To state a claim for conversion under New York law, a plaintiff must allege "(1) legal ownership or an immediate superior right of possession to a specific identifiable thing and (2) that the defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Ancile Inv. Co. Ltd. v. Archer Daniels Midland Co.*, No. 08-9492, 2011 WL 813724, at *14 (S.D.N.Y. Mar. 8, 2011) (internal quotation marks omitted); *accord Colavito v. NY Organ Donor Network*, 8 N.Y.3d 43, 49–50 (2006) ("A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession.").  Plaintiffs, however, point to no specific identifiable thing that Prusky allegedly converted.  Instead, they vaguely allege that "Defendants wrongfully converted monies and assets from Plaintiffs."  (SAC ¶ 140.)[31]

---

transaction upon which Plaintiffs focus in the Second Amended Complaint is the marketing of the BETA Plan through the BETA Plan Sales Packet, (*see, e.g.*, *id.* ¶ 136); and the sales packet itself indicates that it was sent from John Rau in Tampa, Florida to Plaintiffs' accountant, (*see id.* Ex. B, at 3), the location of whom Plaintiffs do not allege.  There is no indication that the BETA Plan Sales Packet or any other potentially misleading statements were received by Plaintiffs anywhere but in Colorado or Florida.  Accordingly, the Section 349 claim is subject to dismissal for a failure to adequately allege a New York transaction.  *See Goshen*, 98 N.Y.2d at 325–26.

[31]     Money may be the subject of a conversion claim, but it must be "specifically identifiable and be subject to an obligation to be returned or to be otherwise treated in a particular manner."

Plaintiffs argue in their Opposition papers that "Plaintiffs plead that they developed possessory rights and interests in the Plan" and that "the diversion of welfare funds amounts to conversion," (Pls.' Opp'n to Prusky at 19), but they do not identify the funds to which they refer or explain how they were diverted from the BETA Plan.  Even if Plaintiffs had adequately identified the property converted, they have not sufficiently alleged that Prusky exercised dominion or control over such property.  The Second Amended Complaint contains no allegations regarding money Prusky received in connection with its representation of Designs, let alone allegations suggesting Prusky ever received funds from the BETA Plan or funds belonging to Plaintiffs.  In the absence of allegations that Prusky exercised dominion or control over Plan funds or Plaintiffs' funds, the conversion claim must fail.  *Cf. United States v. Santiago*, 528 F.2d 1130, 1132–33 (2d Cir. 1976) (union president converted welfare funds where it was found he actually removed and transferred money to general union coffers).

### D.      Leave to Amend

Leave to amend a complaint should be freely given when justice so requires.  Fed. R. Civ. P. 15(a)(2).  It is within the sound discretion of the district court to grant or deny leave to amend. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  "Leave to amend, though liberally granted, may properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Amendment is futile when the claim as amended cannot

---

*Robert Smalls Inc. v. Hamilton*, No. 09-7171, 2010 WL 3238955, at *8 (S.D.N.Y. July 19, 2010) (internal quotation marks omitted).

"withstand a motion to dismiss pursuant to Rule 12(b)(6)," and "[i]n deciding whether an amendment is futile, the court uses the same standard as those governing the adequacy of a filed pleading." *MacEntee v. IBM*, No. 08-7491, 2011 WL 812395, at *8 (S.D.N.Y. Mar. 3, 2011) (internal quotation marks omitted). Where the problem with a claim "is substantive . . . better pleading will not cure it," and "[r]epleading would thus be futile." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

At the December 18, 2009 pre-motion conference, the parties and the Court discussed numerous deficiencies in Plaintiffs' First Amended Complaint. Further, the unsuccessful mediation provided the parties with another opportunity to discuss the First Amended Complaint. As Plaintiffs noted in their letter to the Court dated April 1, 2010: "[T]he mediation . . . allowed Defendants' counsel to state their objections to Plaintiffs' allegations. Thus, Plaintiff wishes to address as many of Defendants' concerns as reasonable . . . by filing a Second Amended Complaint and then moving forward with the litigation." (Doc. 49, at 1.) Plaintiffs were permitted to amend by stipulation and order dated April 12, 2010. (Doc. 50.) They thus have had the opportunity to address the weaknesses in the First Amended Complaint.

Moreover, Plaintiffs have not requested leave to amend their Second Amended Complaint, demonstrated how further amendment would cure the deficiencies that remain in their pleadings, as identified in Defendants' papers, or submitted to the Court a Proposed Third Amended Complaint addressing such deficiencies. This alone is sufficient ground to deny leave to amend *sua sponte*. *See, e.g.*, *Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 799 n.7 (2d Cir. 1980) ("[A]ppellants never sought leave to amend their complaint either in the district court or as an alternative form of relief in this court after [appellee] raised the issue of the sufficiency of appellants' complaint. Accordingly, we see no reason to grant such leave sua sponte."); *In re*

50

*Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (plaintiffs "were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies") (internal citations omitted); *see also Ruotolo*, 514 F.3d at 191 (affirming denial of leave to amend "given the previous opportunities to amend").

In short, because the bases of the dismissals were raised prior to the most recent amendment, (*see* Docs. 30, 35 (discussing Rule 9(b), reasonable reliance, absence of fiduciary status, failure to allege consumer-oriented conduct, inadequate pleading of contract, and failure to identify converted property)), or are substantive (reliance on Prusky's December 7, 2007 memorandum, conspiracy between Prusky and Moritt, fiduciary status, enterprise, consumer-oriented conduct), or both, leave to amend is denied.

## III.     CONCLUSION

For the reasons set forth above, Defendants' motions to dismiss are GRANTED in part and DENIED in part.  The remaining claims are:  (1) the fourth cause of action alleging fraud against Moritt based on the December 16, 2002 and December 17, 2002 letters, and against Designs on the theory that it conspired with Moritt; and (2) the ninth cause of action alleging negligent misrepresentation against Moritt based on the December 16, 2002 and December 17, 2002 letters.  All other claims are DISMISSED without leave to replead.  The Clerk of the Court is respectfully directed to terminate the pending motions.  (Docs. 53, 56, 59.)  Counsel for Plaintiffs, Designs, and Moritt are directed to appear before this Court for a conference on Tuesday, May 3, 2011, at 4:00 p.m.

**SO ORDERED**.

Dated: March 30 , 2011
         White Plains, New York

CATHY SEIBEL, U.S.D.J.